## BRUNSWICK and others v. WINTERS' HEIRS.

### Filed January 30, 1885.

MINES AND MINING—ADVANCEMENTS FOR DEVELOPMENT—LIEN.
> Parties accepting a fourth interest in a mine in consideration of "one dollar," and the understanding that they will furnish the money and do the work necessary to develop the property, and who, in doing so, have the work entirely in their own hands, and can stop whenever they see fit, cannot, when the development has advanced to a certain stage, and the indications are good, shut down the mine, refuse to work it themselves, or allow their co-owners to work it, demand instant payment of all the money expended, and establish a lien on the whole property therefor.

Appeal from Third judicial district, Grant county.
*Catron, Thornton & Clancy*, for appellees.
*Childers & Fergusson*, for appellants.

AXTELL, C. J. The facts in this case are substantially as follows:

In August, 1879, John V. Winters was the owner of 750 feet of mineral ground known as the Homestake mine, situated in White Oaks mining district, Lincoln county, New Mexico. There had been

no mining work done upon this mineral ground, and it was called :a mine out of compliment to a quartz boulder bearing gold which ·cropped out upon its surface. In December of the same year, Winters offered to give J. J. Dolan 250 feet of his 750 feet for "friendship's sake." Dolan said: "Jack, we are too poor to develop this mine, and I will give part of my interest to raise development money." Then Jack said: "Well, Jimmie, if you are so generous as that, I will add another 100 feet and make it 350 feet." On the twenty-third day of December of same year, Winters executed a deed to .Dolan's wife for this 350 feet of said mine. The consideration expressed in the deed was "one dollar, together with other good and ·sufficient considerations." On the same day, Dolan and wife, for same ·consideration expressed as in former deed, conveyed one-half of their interest to Joseph A. La Rue, one of these plaintiffs. It afterwards :appeared that Brunswick was a silent partner of La Rue. There are no other written contracts or agreements, but the record is quite full of oral statements and admissions as to what the parties did, and what their understanding was. Brunswick and La Rue advanced a large sum of money—from $6,000 to $10,000—for the purpose of working the mine. It was not so much development work as it was mining. They sunk a shaft, run drifts, and took out gold-bearing ·ore. The mine appeared to be very good, and all parties went forward with hope and courage. Some $1,000 or $2,000, at least, had .been taken out of the ore, and there appeared to be "millions in it." 'The value of the mine was estimated as high as $120,000, and Winters, with his share of what was contained in one of the pockets, .bought a "wagon load of whisky and made the whole town drunk." .At last he reached "his homestake," and died about March, 1881.

At this point Brunswick and La Rue presented a bill of over $10,-·000 against the mine, and claimed a lien for that amount, as it was money, provisions, and so forth furnished for development work, and .demanded instant payment. Winters' heirs sought to work the mine, but were enjoined. The injunction was dissolved and this bill was filed. A receiver was prayed for and appointed. A master was also ·appointed, and hundreds of pages of testimony taken. A trial was had and a decree obtained by the plaintiffs in their favor. By this ·decree it was found that $6,259.44.02⅓ is the sum which the complainants are in equity entitled to secure in the first instance out of :this mining property after payment of the costs and expenses of this ·suit. "It is therefore ordered, adjudged, and decreed that the aforesaid mining claim, known as the 'North Homestake,' together with all and singular the ores extracted therefrom and undisposed of, and all tools, materials, machinery, and other property, be sold at public auction for cash." This consummation is reached nearly four years after the poor old man's exit, and equity rejoices that every man comes by his own, even to the one-third of a mill. From this decree Winters' heirs appeal. The defendants assert that their ancestor made a gift to Dolan of 250 feet for "friendship's sake," and added another 100 feet for development work, but upon the same day Dolan deeded one-

half of his interest to La Rue, and that afterwards the consideration for this deed, while expressed at "one dollar, and other good and sufficient considerations," was, in fact, for the consideration, and with the express understanding and agreement, that La Rue should furnish means, viz., money, tools, etc., to prospect or work this mineral ground to determine whether or not there was a mine there; whether the claim was worth working. It seems especially important at this point in the case to determine what position Winters occupied as to the other two. What understanding, if any, existed between Dolan and La Rue we are not called upon to consider. Winters owned 750 · feet of mining ground. He gave 350 feet of it to other persons without any present consideration other than friendship and for development work in future. This not only gave these other persons permission, but it invited them, to dig upon this ground at any point they saw fit, to ascertain whether or not it was valuable for mining purposes.

This brings us at once to the pivot of this case: Could La Rue and Dolan, by expending work and money in developing this mine, and without some express agreement, compel Winters to be their debtor, or did they go forward voluntarily, and at their own risk? From the evidence it appears certain that they controlled the working of the mine. They were at liberty to stop any day they pleased. It is not claimed that there was any agreement for them to go forward, nor any understanding as to how much money they were to expend, nor how much work they were to do. They were prospecting their own mine,—a mine which had been given them,—and when they reach a certain stage in its development, they stop work, shut down the mine, will not work it themselves, nor permit Winters' heirs to work it, and demand payment for all the money they have put in the mine, not for a contribution as partners, but to foreclose a lien upon the whole mine. They do not claim any debt due from Winters personally, but claim that the whole mine is responsible to them for the whole amount put in. We are not called upon to determine what relation Dolan holds in this proceeding,—whether he ought to be plaintiff or defendant. We are simply considering the position which Winters occupies. The man who originally owned all the ground, and who gave away nearly one-half of it for friendship's sake and development work—can he be made the involuntary debtor of the men who accepted his gifts and have voluntarily expended their money in hunting for gold upon his and their ground, and sold out because they failed to get their money back? As well might the thousands of miners who have spent years of toil and millions of money in unsuccessful search for mines, sue the United States, by a bill in equity, and claim a lien upon the public domain, because the general government gave them permission to search for mines.

If called upon to presume anything, we would presume that La Rue and Dolan agreed to do a certain amount of development work; but, in the absence of any agreement, we cannot presume even this; and certainly we cannot presume that Winters promised to pay them

for the work which they did, or caused to be done, upon the mine. That Winters, Dolan, and La Rue might have incurred debts, and that the mine might have been sold on execution to satisfy the same, is quite true; but that is not the case before the court. La Rue himself says that when he took an interest in the mine "it was a mere matter of chance whether the lead would turn out anything or not. If it did, we all wanted to make all the money we could; if it did not, that was the end of it." Again he says: "As the mine showed up promising, we all agreed to develop it further." The bill itself says that there was an agreement that all the moneys advanced by plaintiff should be repaid to them out of the first proceeds of said mine derived either from working or sale thereof. There is evidence that La Rue was to look to the mine to repay him for his advancements. He himself says: "If the mine had turned out valueless, I would have lost the money I first advanced." Again he says: "I always thought the mine could be sold for any amount I risked in it; that there was no individual liability; that the mine itself was responsible." There is also testimony to the effect that he had a lien upon the mine for his pay; that it would pay him back his money with big interest, etc. That is, that all the parties engaged in the enterprise hoped it would turn out well and pay them big. But from all this we cannot find that he had such a lien as the one contemplated in this bill. We are of opinion that the decree of the district court must be vacated and set aside, and the bill dismissed, and that defendants recover their costs both in the district and supreme courts; and it is so ordered.

BELL and WILSON, JJ., concur.